UNITED TRACTION COMPANY, Plaintiff, *v.* KATHERINE MONOHAN, FRANK BROOMHEAD, et al., Defendants.

In re FRANK BROOMHEAD, Respondent.

(Supreme Court, Albany Special Term, October, 1921.)

Injunctions — illegally operating jitneys — evidence — criminal contempt— jail sentence.

> At the time of the imposition of a fine upon a plea of guilty of having violated an injunction order restraining respondent and his codefendant in the action from illegally operating so-called " jitneys " in competition with plaintiff, a public service corporation, the court admonished each of the defendants that it would deal more severely with them if there was a repetition of the offense. At least twice since then the respondent has repeated the offense. *Held,* that where upon motion to punish him as for a criminal contempt, he asserted that he had never violated the jitney law at any time, but the court is satisfied that his version of the service of the injunction order upon him and of the attendant circumstances was clearly false, his denial of the charge made against him is not entitled to credence, and that as to accuse of perjury the complainant's witnesses whose

testimony in the light of all the facts was straightforward and not shaken on cross-examination would be a denial of justice, the respondent is adjudged guilty of the contempt charged, and sentenced to imprisonment in the county jail for the period of thirty days.

PROCEEDING upon the wilful violation of an injunction.

John E. MacLean and J. Stanley Carter, for plaintiff.

Orville R. Ely, for respondent.

HINMAN, J.    The respondent Frank Broomhead is charged with criminal contempt of court in having wilfully violated an order of this court signed by me in the above-entitled action restraining the respondent and his co-defendants from illegally operating so-called " jitneys " in competition with the plaintiff. The respondent was brought before me in a similar proceeding on September tenth last and at that time pleaded guilty to a violation of the same order.    A fine of $100 was imposed and the respondent and a number of others who pleaded guilty at the same time were admonished by the court that a repetition of the offense would be more severely dealt with.

The court recognized the state of mind which had been permitted to prevail amongst the so-called jitney operators that even though the Appellate Division had held their acts to be a crime, the processes of the criminal law were inadequate to punish them and that somehow they were above the law.    So they continued to openly and flagrantly violate the law and held it in almost perfect contempt until it became apparent that the lawless of this section of the state were being schooled to become more lawless, the thoughtless

amongst us to lose what respect they may have had for law and order and the sober-minded and far-sighted to feel uneasy for the future when the law could be so flagrantly defied with impunity. The fact that there has been a strike here, with the lines of sympathy and prejudice drawn tightly, has unfortunately dulled the sensibilities of many as to the effect of toleration of lawlessness, but judges of the courts are chosen to deal dispassionately with all parties and to enforce the law with even-handed justice, protecting the rights of all under the law, the popular and the unpopular.

It thus becomes painfully evident that if justice is to be done in this community and the supremacy of the law upheld, it is the duty of this court to exercise its powers fully in that behalf. It was clear that the bold and fearless operators of jitneys must be taught that there is a remedy which is capable of reaching them without failure and without great delay. The fine promptly imposed, though moderate, was sufficient to carry this thought sharply to the minds of the offenders.

It is the policy of the law to deal more gently with first offenses wherever possible, but the wilful renewal of the offense cannot be tolerated. It must be dealt with sternly and the charge made here against the respondent Broomhead is that he has repeated the offense at least twice since receiving punishment and kindly admonition. If guilty, it is my duty to impose a more severe penalty this time as punishment to him and as a warning to others.

Cases arise in the courts where circumstances point to the guilt of a party but where evidence of such misconduct is difficult to secure except by paid witnesses. This is one of those cases. The courts "* * * must take such evidence as the nature of the case per-

mits, circumstantial, direct or positive, and bringing to bear upon it the experiences and observations of life and thus weighing it with prudence and care, give effect to its just preponderance." *Yates* v. *Yates,* 211 N. Y. 163, 170.

The witnesses for the complainant have been called private detectives by counsel for the respondent in an effort to discredit their testimony. While courts and juries have been justified on different occasions in looking with suspicion upon the evidence of private detectives, " it has not been determined as matter of law that such evidence cannot be considered    *   *   * but rather has declared that in the consideration of the same only such weight should be given to that class of evidence as the conscience of the judge or jurors shall determine the same entitled to receive." *Yates* v. *Yates, supra,* 172. But even that rule has been applied to that class of persons who have held themselves out to the public as engaged in the detective business. In this case, the complainant has utilized its own employees and the wives of its own employees who when they have disclosed the nature of their occupation by openly testifying in court can no longer continue such work. They are paid witnesses to be sure but they come within the rule which recognizes employees as mere interested witnesses. They are not in the private detective class since they do not make their regular livelihood in such business. But as interested witnesses they are classed with parties themselves and relatives of parties, such as the wife, mother and sister of the respondent Broomhead.

This does not mean that such witnesses do not tell the truth. It means that the court or jury is to determine whether or not the interest of the parties or their employees or relatives is such that they are liable, unintentionally or otherwise, to color their testimony

for their own benefit or for the benefit of the party by whom they are produced as witnesses.

So in reviewing the testimony in the case, the law gives as great weight to the testimony of the complainant's witnesses as it does to the respondent Broomhead himself or to his relatives and leaves to the court the duty to test the evidence of all of them by the usual rules as to credibility, namely, to determine from their appearance on the stand and from their whole testimony and from all the facts and circumstances, what witness is worthy of belief and what witness, if any, is unworthy of belief.

I am satisfied that the respondent Broomhead was not telling the truth. In many particulars his testimony was clearly false. He positively asserted that he had not been violating the jitney law at any time but had always charged for his car by the hour or charged according to the distance, charging one dollar and twenty-five cents to go from Cohoes to Troy whether he had one passenger or more and collected the fare from one person only. Yet he pleaded guilty to a former offense and paid his fine. And on the morning of September twenty-third when he was served with the order to appear before me to answer to the present charges, he admits that he had at least two passengers in his car that he had picked up at two different points. He says he was giving them a free ride, but while he says he didn't know the lady and at first said he didn't know the man, his subsequent testimony convinced me that he did. Nevertheless, the man is not brought to court to substantiate his story although he knew that the question of his treatment of the order served on him in the presence of that man had been presented to the court by the affidavit of the person who served the order.

He was able to identify on the witness stand the

paper served upon him by reference to its appearance, its color and as to how it was folded, but in his affidavit he says he thought it was an advertising pamphlet.

He admits that he carried the process server on his running board for a considerable distance and didn't even then stop his car to let him get off, but threw open his door and told him to get off, that he didn't want any of his junk, and claims that the opening of the door caused the paper to blow out of the car. Who can believe that if he thought it was only an advertisement he would not have stopped at once and certainly eventually to let the fellow off? He was not in such a hurry that he could not stop to take on the man passenger and again to take on the lady and according to his story he did it to give each of them a free ride. The fact is that he did know he was being served with the order when the car had stopped to take on the lady and he was fully informed as to what it was and the signature of the justice was shown him, but he was so angered by it and by being caught taking on a passenger at the very time, that he kept Rafter on the running board of his car which he had started and didn't stop to permit him to get off but carried him along some distance and then shouted " get off," slackening the speed sufficiently for the purpose.

His story of the advertisement is so unbelievable that I cannot credit his version of how the order served on him got out of the car into the street. He says it got out when he opened the door and told Rafter to get off. But he did not need to open the door in order to tell him to get off as he admits the window in the door was open. Is it believable that he opened the door to force a poor innocent advertisement peddler off the running board of his car while the car was running? He does not state that Rafter was annoying him in any way except that he handed this paper

through the window which he thought was an advertisement pamphlet. I can only believe that he knew just what had happened and that in his anger he ran his car on so fast that it was unsafe for Rafter to get off and after Rafter did get off he opened the door and kicked the order out in the street as Rafter says he did. With reference to the service of the order, Rafter is corroborated by his father who was driving his car in the rear, assisting in the service of the order.

Broomhead's explanation of the opening of the door was necessary in order to explain how the order got in the street so that he could not be charged before me with contemptuous treatment of the order served upon him in addition to the other charges and so that he could make more plausible his pretense that he had no knowledge or information that the paper was an order of this court until Mr. Juber told him on the telephone about it on Sunday as narrated in the newspapers, as he stated on the witness stand, or '' until he was so advised on Monday the 26th instant,'' as stated by him in his affidavit, another example of his imposition upon the court with false testimony.

The fact is that he did know about it, that he was conscious of his guilt as soon as he was served, which is the only reasonable explanation of his treatment of Rafter. It is the only reasonable explanation of his hasty trip to North Adams that very day and his subsequent concealment at his uncle's home at Guilderland Center. He says he went there to rest, which is absurd. He was there with a guilty conscience, to hide. He didn't even let his family know he was going there or that he was there. He didn't telephone his family but to his friend Juber to let him know where he was and that was on Sunday, he says, after he had been at Guilderland Center since Friday night.

Supreme Court, October, 1921.          [Vol. 116.

How can I believe his denial that he had talked to one of his own witnesses who says he saw Broomhead at Cohoes on Sunday and that Broomhead told him they had gotten him for jitneying again and asked him to tell Paul Dussault that it was Monday he was in the garage? He denies having talked to this witness at all until the Thursday following such Sunday and yet he had an affidavit typewritten and ready for that witness to sign on Thursday, which can only be explained on the record before me on the theory that his witness was telling the truth when he said he did have a previous talk with Broomhead.

Of course, Broomhead wanted to substantiate his affidavit in which he had said he had no knowledge or information that the order had been served on him until Monday, the twenty-sixth, but on his examination he let it slip that he had talked with Juber over the telephone and that Juber had told him about it. So I can readily believe that he was in Cohoes by Sunday night at least. Gamarche, his witness, says he heard Broomhead's mother say he was back on Sunday. Having lied about not having any information as to the order until Monday and having lied about not being at Cohoes on Sunday, I can readily believe he was lying when he denied having made the statement credited to him by Gamarche.

I can believe, therefore, more readily that his trip to Massachusetts was a guilty flight from justice and that his unpremeditated sojourn at his uncle's home at Guilderland Center was for concealment only. He found that he was able with the help of his family and friends to make a plausible but only half-true defense and was, therefore, persuaded to face the charge.

But he does not appear personally in court Monday, the return day set in the order. He obtains delay by imposition on the court with the false story that he

was away attending to getting some work at North
Adams, when in fact he had returned on Friday from
that place and was simply resting, as he says, at Guild-
erland Center, a short ride from here, and presumably
he had his car with him. He permitted his attorney to
come to court with the story that he had been employed
by someone else in Broomhead's behalf and in his
absence, too late to make a defense, when the fact was
he was home Sunday as his mother and Gamarche say
and he could have been ready and he could have been
present in court personally on Monday. Proper
respect for the court should have prompted a more
respectful course, and an easy conscience as to his
innocence and ability to make a defense would, if true,
have lead him to take the first opportunity to state his
innocence to the court with such disclosure of his
defense as time had afforded to him. Instead, his
course has been one of lying and deceit.

The credibility of all of his testimony is destroyed.
No reliance can be placed upon any statement he has
personally made. His denial of the charges made
against him has no weight and if his story is to be
believed in any part it must be because it is corrobo-
rated by the credible testimony of other witnesses.

Of course, the testimony of his wife, his mother and
his sister is the testimony of interested witnesses.
The story of the trip to Saratoga is not corroborated
by any other witness. The affidavit of the two ladies
who say that they rode with him on that afternoon of
September seventeenth does not set forth the time of
day that they claimed they rode with him. How was it
that he was satisfied to have his family make affidavit
accounting for only the afternoon of that day by a
trip to Saratoga? Was it guilty knowledge that he
had operated his jitney only in the afternoon of that
day? Their supporting affidavits account for his time

Supreme Court, October, 1921.    [Vol. 116.

only from one P. M. on and yet he alleges in his affidavit that he was home all morning where at least his wife and mother could have seen him and corroborated him.

They all say that they left Cohoes at one-thirty and did not get back from Saratoga until six-thirty and that they kept going all the time and did not stop even for gas and the car was running properly all the time, taking about five hours for a trip that could be made in his car in less than half that time. If they travelled only fifteen miles an hour, it would not take over four hours. If they went twenty miles an hour, it would take three hours. If they went twenty-five miles an hour, it would take about two hours and a half. If they travelled thirty miles an hour, it would take about two hours, bringing them back by half past three. Assuming that they left Cohoes at one-thirty, it was possible to get back to Cohoes easily in time for Broomhead to operate his car as a jitney for the late afternoon rush and to have started for Troy about four o'clock as charged by the complainant's witnesses who say they boarded his car at Cohoes at that time and rode with him to Troy.

I am prepared to believe that the trip to Saratoga was taken but I cannot believe that they travelled at the ridiculously slow rate of twelve miles an hour. The witnesses have not been accurate as to the time when they reached home. The mother and sister may have been honestly mistaken as to the hour of return. I am prepared to give them the benefit of that doubt. I would likewise give respondent's wife the benefit of a similar doubt if her other testimony and her bearing upon the stand had not convinced me that she was not truthful and frank but was very evidently trying to shield him as she thought it was necessary for her to do. Specifically I recall her testimony that he had never left the house any morning before about ten

o'clock either before September tenth or since that time and yet he was shown to have been at the garage on the nineteenth at nine o'clock and was picking up passengers at eight to eight-twenty on the twenty-third when he was served with the order.  She attempted to exonerate him from having operated a jitney at any time, which she knew to be false.  He admitted it himself when he pleaded guilty to the former charge and he says he paid very little attention to the precise charge made against him, showing that he was so regularly engaged in the business that he had no hope of clearing himself.  No other occupation on his part from the date of the start of the strike to the present is even suggested by the evidence and while I am not trying him for his conduct previous to September seventeenth, I am bound to take such facts into consideration in testing the credibility of his wife's testimony.

Taking up the incident of September nineteenth, I can readily believe that much of the testimony of Broomhead's witnesses is true, namely, all of the testimony which goes to show that he was cleaning and greasing his car on that day, starting about nine A. M. But that is far from proving that he was not engaged in operating his car as a jitney at seven-twenty-one to seven-thirty that morning, as charged.  Nobody attempts to account for his whereabouts that morning prior to nine o'clock.  He could have reached from the garage in fifteen or twenty minutes the point where the complainant's witnesses said they entered his car at seven-twenty-one and from the point where the complainant's witnesses said they alighted from his car in Troy at seven-thirty he could, by a shorter route, have reached his garage in fifteen or twenty minutes.  In less than fifty minutes he could have taken his car out and have returned with it to the garage and have gone home for his breakfast prior to eight o'clock.

The witness Hotchkin did not get to the garage until eight o'clock. His testimony is immaterial. The same is true of the testimony of the witness who arrived at the garage at ten-thirty and said he saw the respondent working on his car. The witness Hebert says he arrived at five minutes to seven and was there for a few minutes talking to Marsette, the vulcanizer, and then went to a store diagonally across the street and about 100 feet north of the garage where he went for cigarettes and remained there talking to someone until shortly after eight o'clock, when Hotchkin, whom he helped as a mechanic, arrived. He makes no pretense that he was watching the garage doorway while he was there and his negative testimony that he did not see respondent go out is valueless. Hebert would have us believe, moreover, that he came to the garage for no particular purpose at the early and for him the unprecedented hour of five minutes to seven, when his work as helper to Hotchkin did not begin until eight, and it seems strange that he should have just happened to be there so early on the day he says his employment ceased.

Marsette, the vulcanizer, swore in his affidavit that he was in and out of the garage twelve to fifteen times between seven A. M. and eight P. M., whereas on the stand he says it was six o'clock that he arrived there and that he was there continuously until twelve when he went to lunch, returning at twelve-thirty, after which he remained in the garage continuously until six, when he went out for supper and returned in the evening. This discrepancy between his affidavit and his sworn testimony destroys his credibility and his explanation of his affidavit left him equally vulnerable. It is also significant to note that he was only occasionally occupied at vulcanizing and did not pretend to have any other occupation, yet he had bought an auto

after the strike began which he used about three months and then bought a larger one which he has used about four months and before the strike he had never owned one. It is not difficult to infer that he has been a jitney driver himself and was interested to help Broomhead clear himself of these charges.

To further discredit the testimony of both Hebert and Marsette, it appears from the testimony of Gamarche, who was sworn on behalf of the respondent, that Gamarche for months had been getting to the garage at six-thirty in the morning and he had never seen either Hebert or Marsette there at that time. But even if Marsette was there that morning at that time, which I do not believe, his work kept him constantly upstairs over the office and respondent could have taken out his car without his knowledge, just as it might have been taken out without the knowledge of Hebert. And the same is true of Paul Dussault, the proprietor of the garage, who says he got there about six o'clock and after moving the cars around on the floor he went to his breakfast, returning between eight and nine o'clock. He was out of the garage during the whole of the time when it was entirely possible for Broomhead to have taken out his car and after operating it as charged, to have returned with it before eight o'clock.

All three of these witnesses, Dussault, Hebert and Marsette, state that they saw Broomhead's car in the garage when they reached the garage. I am convinced, however, that they are by no means sure of it and were giving Broomhead the benefit of the doubt or that they were lying about seeing the car there when they said they saw it or that they were not there as early as they said they were. The cleaning of the car that day, which took all day, was a matter they could readily fix in their minds but I would be gullible indeed if I

were to believe that seven or eight days afterward, with nothing to fix it particularly in their minds, they could say positively that they saw the car that morning before Broomhead started to work on it at nine o'clock, in view of the other unsatisfactory nature of their testimony. For years Broomhead had garaged his car there. They were his friends. If the testimony of his wife is true that he was not in the habit of leaving the house before about ten o'clock, the garage men would know that his car would be there until that time usually, so there would be nothing out of the ordinary in finding his car there that morning that would tend to fix the fact in their minds. But in any event, nothing was shown to have occurred that would so fix it in mind as to permit them to remember it after such a long lapse of time. The garage was a large one and crowded with many cars.

Thus it appears that Broomhead has failed to establish an alibi for either of the times when he is charged with violating the injunction, and the question of his guilt or innocence rests between his own unsupported and utterly discredited testimony and that of the four witnesses of the complainant.

The respondent's car with its detachable winter top presented a sufficiently unusual appearance to be readily identified. The respondent is a man whose features could be readily remembered and identified. I am satisfied that the witnesses for the complainant could not easily be deceived as to his identity or that of his car, and unless their two charges were fabricated, no mistake could have been made by them in charging that the respondent Broomhead was the man and his car was the car which was being operated on the two occasions in question.

I am convinced that the charges were not fabricated but were true. It is not even difficult to understand

how the man who is claimed to have entered the car as a sixth passenger on the occasion of the nineteenth could have appeared to sit on a portion of the door when in fact he was really leaning his back against it with his feet on the floor of the car and his body leaning forward enough to get balance and not strike his head against the top of the car. It has been notoriously common to see jitneys most uncomfortably crowded constantly on the streets. If the man was not there at all, it seems absurd that any mention should have been made of him as his presence was not necessary to the proof of the charge, and if it be argued that it tends to prove that it was not Broomhead's car, I am unwilling to believe that such intelligent witnesses could have failed to identify either Broomhead or his easily identified car.

The witnesses Oliver and Dunn were the same witnesses who had obtained the proofs against him in the earlier proceeding and Broomhead pleaded guilty to their charge without even requiring them to come into court to testify. This time he ran away with a guilty conscience and returned only when he thought he could prove an alibi.

The testimony of all the complainant's witnesses was not only credible in the light of all the facts and circumstances but the witnesses themselves, particularly Oliver and Mrs. Goddard and Mrs. Eaton, impressed me most favorably. Their testimony was straightforward and remained unshaken by cross-examination. They were calm and unaggressive in their demeanor. To accuse them of perjury in the light of their appearance, their past lives as revealed by them, their intelligence and the failure to discredit their testimony, and to prefer to accept instead the clearly unreliable testimony of Broomhead alone, would be a denial of justice. This is my clear conviction after seeing the

witnesses, listening to counsel and giving the whole testimony the serious consideration which it deserves.

I find the respondent guilty of violating the injunction on the 17th and on the 19th days of September, 1921, as charged, and direct that an order be entered adjudging him guilty of a criminal contempt of court and punishing him by imprisonment in the Albany county jail for a period of thirty days.

Ordered accordingly.